IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JASON PHILPOT and PATRICK
BERNARD REESE,

Defendants.

CRIMINAL CASE NO.
1:15-CR-028-WSD-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Pending before this Court is Defendant Jason Philpot's ("Philpot") Motion to Suppress Evidence and Statements and Defendant Patrick Bernard Reese's ("Reese") Motion to Suppress Statements and the Fruits Thereof and Motion to Suppress Unlawful Arrest and the Fruits Thereof. (Docs. 26, 37, 41). Having considered Defendants' motions, the parties' briefs, and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant Reese's Motions to Suppress should be **GRANTED IN PART AND DENIED IN PART**. (Doc. 26, 41). Defendant Philpot's Motion should be **DENIED**. (Doc. 37). There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial. Therefore, this action is **CERTIFIED READY FOR TRIAL**.

## DEFENDANTS' MOTIONS TO SUPPRESS

### I.   BACKGROUND

#### A.   Officer Anderson Responds to a Robbery

On September 30, 2014, Police Officer Lynn Anderson of the DeKalb County Police Department responded to a robbery call at approximately nine o'clock p.m. (Tr. of Nov. 17, 2015 Evid. Hrg., hereinafter "Tr.," 10-11).  The radio dispatcher advised Officer Anderson that the robbery, believed to be perpetrated by two black males, was in progress at the Waffle House located on Northlake Parkway and Lavista Road. (Tr. 11-12, 18-19).  The location was approximately three blocks from police headquarters and right across the street from where Officer Anderson was located at the time. (Tr. 11-12, 18-19).  When Officer Anderson arrived at the Waffle House, a bystander located across the street from the Waffle House pointed to the westbound traffic near the intersection of Lavista and Northlake and said "that's the guys over there." (Tr. 12, 19-23, 53).  According to Officer Anderson's report, the bystander told him that the suspects were leaving in a van. (Tr. 19, 22-23, 28-29).  At the time of the hearing on November 17, 2015, however, Officer Anderson stated that there was no van and thinks that he meant to indicate that the bystander identified a vehicle instead. (Tr. 19, 22-23, 28-29).

#### B.   Officer Anderson Blocks Traffic and Pursues Suspected Robbers

Officer Anderson blocked two lanes of westbound traffic with his patrol car where between six and eight cars were waiting at the red light. (Tr. 12, 22, 55).  In

2

Officer Anderson's view, blocking the intersection with the patrol car while running blue lights meant that no one should leave the intersection. (Tr. 24). According to Officer Anderson's report of the incident prepared approximately five hours later, Officer Anderson exited his patrol car, removed his gun, and walked towards a vehicle "fitting the description of the van." (Tr. 23, 27-29). Officer Anderson now testifies, however, that there was no van, but that he approached a vehicle with two black males inside it. (Tr. 28-29, 31).

After Officer Anderson approached the vehicle, he noticed a Maroon Chevy Lumina, headed westbound, proceed around the car in front of it into the opposite lane of traffic and then turn left at a high rate of speed into a Texaco gas station. (Tr. 12-13, 30, 32-36, 56, 67). Although Officer Anderson observed that the Lumina was occupied by two black males, he could not discern any other identifying characteristics from his vantage point. (Tr. 32-37). Officer Anderson suspected that the occupants of the Lumina were the robbers and started pursuing the Lumina in his patrol car with his blue lights running. (Tr. 13-14). According to Officer Anderson, the Lumina was driving at a high rate of speed and did not stop even though he activated his blue lights. (Tr. 14). The Lumina proceeded through the gas station and then behind a Target store. (Tr. 13). After the Lumina went around the Target store, it headed towards an exit ramp, but hit a huge curb, lost control, and flipped upward. (Tr. 15, 76). The driver and the passenger exited the vehicle and the driver began firing a semi automatic weapon or a black rifle at Officer Anderson. (Tr. 15). In addition to the driver shooting at him,

3

Officer Anderson testified that the passenger was also aiming a weapon at him.  (Tr. 46-47).  Officer Anderson ducked behind the steering wheel because he did not have time to pull his weapon and radioed that shots were being fired.  (Tr. 15).

Another officer, DeKalb County Officer Alexander Figueroa-Fred, arrived on the scene when both suspects ran away from the crashed vehicle and they began firing on him as well.  (Tr. 15-16, 48, 73, 76).  Officer Figueroa-Fred noticed that one suspect was wearing all black or a black t-shirt and that the second suspect, clad in a striped shirt, was running with a rifle.  (Tr. 76).  As the suspect wearing black ran, he turned his handgun backwards to shoot it.  (Tr. 76).  The suspect wearing the striped shirt fired his rifle towards Officer Figueroa-Fred's vehicle.  (Tr. 77).  An exchange of gun fire occurred and the driver ran through a Chevron gas station and the passenger ran towards a Budget Car Rental and then into the woods.  (Tr. 16, 48, 63-64, 79).  The suspects were running in the direction of an abandoned steakhouse.  (Tr. 16).  At that point, Officer Anderson got back inside his vehicle to assist in setting up a perimeter around I-285 and Northlake Parkway.  (Tr. 16).

### C.    Reese Is Apprehended and Placed in a Patrol Car

Officer J.R. Pitts arrived at the scene and assisted Officer Anderson in setting up a perimeter.  (Tr. 98-99).  While establishing a perimeter at an abandoned Steak and Ale restaurant near Interstate 285, Officer Pitts heard a noise coming from some bushes.  (Tr. 99-100).  After receiving backup from two officers, a K-9 unit, and confirmation from a source in a helicopter that a heat source was emanating from the bushes, the officers

identified themselves as DeKalb County Police and threatened to send the K-9 unit into the bushes. (Tr. 101). Officer Anderson was present at the time. (Tr. 117). In response, one of the suspects, dressed in black and subsequently identified as Patrick Reese, came out of the bushes and the officers handcuffed him and placed him in the back of Officer Anderson's patrol car. (Tr. 16-17, 49-50, 64, 101-02, 116-18). Officer Anderson testified that Reese was not free to leave. (Tr. 65). The officers then found a plastic bag containing money, a rifle, and a ski mask near the same area where Reese had been hiding in the woods. (Tr. 102).

Officer Anderson did not advise Reese of his <u>Miranda</u> rights and is not aware whether any other officer did so. (Tr. 65). When Reese was placed in Officer Anderson's patrol car, Officer Anderson told Reese, "Man, you all bogus, you bogus for shooting at me, trying to take me out from my family." (Tr. 65). Officer Anderson further told Reese, "How you all in church, you all both shooting at me, try to take me away from my family." (Tr. 17, 65). Reese responded, "Man, I messed up, my grandmother going to be, my grandmother going to be disappointed in me." (Tr. 17, 66). Officer Anderson responded, "Yeah, you did mess up." (Tr. 66).

Eventually one of the K-9 officers picked up a track. (Tr. 103). The officers did not immediately follow the track, but did so after receiving a call that a suspicious person was attempting to force his way inside someone's nearby hotel room. (Tr. 103). After receiving the call, Officer Pitts sprinted towards the hotel location and saw a shorter, bald gentleman, who was wearing blue jeans but no shirt, running around the

5

corner and then up the stairs.  (Tr. 103).  An officer across the street from the hotel yelled for the man to stop, put his hands in the air, and not to move.  (Tr. 103).  The suspect was then apprehended, handcuffed, and placed in custody.  (Tr. 103, 120, 132).

**D.     Reese Is Questioned at DeKalb County Police Headquarters**

On September 30, 2014, Detective Chris Tappan of the DeKalb County Police Department questioned Reese in a ten by ten foot room at the DeKalb County Police headquarters building.  (Tr. 141-42, Ex. 2, at 21:50).  Prior to reading Miranda warnings to Reese, Detective Tappan asked questions about Reese's girlfriend and Reese indicated that "the money" did not have anything to do with his girlfriend.  (Doc. 69, audio disk).  Afterwards, the following exchange occurred:

| Detective Tappan: | Okay, that may be true.  I mean, we can, well I'll investigate whatever you tell me to. |
|---|---|
| Reese: | I don't want to talk to nobody but the feds, man. I just got out the fed. |
| Detective Tappan: | You don't want to talk to anybody but the feds. |
| Reese: | Yup. |
| Detective Tappan: | Okay.  Well, uh, what's your name. |

(Def.'s Ex. 1; Doc. 69, audio disk).  Detective Tappan then proceeded to ask Reese a series of biographical questions, such as his phone number, address, and height and weight.  (Def.'s Ex. 1; Doc. 69, audio disk).  After the conclusion of the biographical questions, the following exchange occurred:

| Detective Tappan: | Alright Mr. Reese.  I'd like to talk to you about |
|---|---|

6

|  | this. Before I do, I got to read this to you, okay? Can you read and write English? . . . Can you read and write English? . . . Yes? Are you under the influence of drugs and alcohol? . . . No? What's the last grade of school you completed? |
|---|---|
| Reese: | GED. |
| Detective Tappan: | GED. So twelve? Alright, as I read this to you, I want you to put your initials on the blank if you understand it. Okay? You have the right to remain silent. If you understand that, I want you to put your initials right there on the blank. |
| Reese: | I don't want to sign. |
| Detective Tappan: | You don't want to sign anything? Okay? |
| Detective Tappan: | As I read this to you, if you understand what I read to you, I just want you to put your initials on the blank saying you have . . . you understood what I read. That's all. Right? You have the right to remain silent. If you understand that line right there, I want you to put your initials on this blank right here. All that means is that you understand that you can not say anything if you want to. . . . [Reese did not sign the form.] |
| Reese: | What, all of them? |
| Detective Tappan: | Yeah, I mean as I read it to you. I just want to make sure you understood. I can just read it to you, if you want. You don't have to sign it. Okay. |
| Detective Tappan: | You have the right to remain silent. Do you understand that? You gotta say yes or no. |
| Reese: | Yes, sir. |
| Detective Tappan: | Anything you say can and will be used against |

7

|  |  | you in a court of law.  Do you understand that? |
|---|---|---|
| Reese: | | Yes, sir. |
| Detective Tappan: | | You have the right to talk to a lawyer and have him or her present with you while you are being questioned. |
| Reese: | | Yes, sir. |
| Detective Tappan: | | Do you understand that? . . . Okay?  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You understand that? |
| Reese: | | Yes, sir |
| Detective Tappan: | | You may exercise these rights and not answer any questions or make any statements.  Do you understand that? |
| Reese: | | Yes, sir. |
| Detective Tappan: | | Okay.  Um.  Being that you understand all your rights, do you want to talk to us? |
| Reese: | | Y'all want to talk to me? |
| Detective Tappan: | | Yeah, but, I mean, you would want to say something too, right? |
| Reese: | | What I got to say? |
| Detective Tappan: | | Well, just, let's start from the top.  What were you doing tonight? |

(Doc. 69, audio tape; Gov't Ex. 2, at 00:28-00:1:48).  Detective Tappan then began questioning Reese.  (Ex. 2).  At the time of the interrogation, Detective Tappan was wearing plain clothes and his firearm was not visible.  (Tr. 142).  Reese was not

8

handcuffed or in leg shackles and was free to move about the room. (Tr. 143). Detective Tappan did not draw his weapon on Reese, did not threaten him, did not make any promises to him, did not raise his voice, and did not subject him to duress. (Tr. 143-44). At the time, Reese did not appear intoxicated or smell of alcohol or marijuana, and did not slur his speech. (Tr. 144). The tone of the conversation between Reese and Tappan was calm. (Tr. 143).

On January 27, 2015, the Grand Jury charged Defendants Reese and Philpot ("Defendants") with aiding and abetting each other to unlawfully take property from a Waffle House on Lavista Road in Tucker by means of actual and threatened force, violence and fear of injury to the person of a Waffle House employee in violation of 18 U.S.C. §§ 2, 1951(a). (Doc. 1). Both Defendants were further charged with knowingly using, carrying, brandishing, and discharging a firearm during the commission of a crime of violence for which Defendants may be prosecuted in a court of the United States in violation of 18 U.S.C. § 924(c)(1)(c) and possession of a firearm after having been convicted of a felony offense in violation of 18 U.S.C. § 922(g)(1). (Doc 1).

Defendants argue the fruits of their arrest, including the guns, duffle bag, and ski masks, and Reese's subsequent statements to the police must be suppressed because the DeKalb police officers did not have reasonable suspicion to detain them or probable cause to arrest them during the traffic roadblock. In support, Defendants contend that at the time Officer Anderson used his police car to stop the traffic in the intersection, he did not have reasonable suspicion that Defendants had participated in the Waffle House

9

robbery because he only knew that (1) two black men robbed the Waffle House; (2) an eyewitness was pointing to the traffic and saying that the suspects were "right there"; and (3) the eyewitness told him that the suspects were driving a van.  Reese further argues his illegal seizure at the time of the roadblock tainted his subsequent confessions to the police and that the guns, duffel bag, and ski masks taken by the police at the time of his apprehension should be suppressed as fruit of the poisonous tree.  Additionally, Philpot argues that evidence obtained during the search of his vehicle was also fruit of the poisonous tree because the warrant to search the vehicle was based on information gained during and as a result of the unlawful seizure at the traffic stop.  Reese contends that the statements he made to Officer Anderson while he was in Officer Anderson's patrol car should be suppressed because Officer Anderson elicited them while he was in custody without reading Reese his <u>Miranda</u> rights.  Finally, Reese further contends that statements he made to Detective Tappan also should be suppressed because Detective Tappan continued to question Reese after he invoked his right to remain silent.

## **LEGAL ANALYSIS**

### I.      **The Seizure During the Road Block Did Not Violate the Fourth Amendment**

Defendants argue the fruits of their arrest, including the guns, duffle bag, and ski masks, and their subsequent statements to the police must be suppressed because the DeKalb police officers did not have reasonable suspicion to detain them or probable cause to arrest them during the traffic roadblock.  Additionally, Philpot argues the

10

evidence obtained during the search of his vehicle was also fruit of the poisonous tree because the warrant to search the vehicle was based on information gained during and as a result of the unlawful seizure at the traffic stop.  Specifically, Defendants contend that Officer Anderson unlawfully seized and arrested Defendants when he blocked traffic without reasonable suspicion that they were involved in the robbery.  The Government argues Officer Anderson's traffic blockade was lawful because he had reasonable suspicion that the suspects who robbed the Waffle House were among the individuals stopped.  In support, the Government points out that Officer Anderson's traffic stop was supported by reasonable suspicion because he learned of the armed robbery of the Waffle House via radio, drove towards the Waffle House, and interacted with a witness who pointed him in the direction of the suspects.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV.  "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision."  Whren v. United States, 517 U.S. 806, 810-11 (1996); accord Draper v. Reynolds, 369 F.3d 1270, 1275 (11th Cir. 2004), cert. denied, 543 U.S. 988 (2004).  A seizure for Fourth Amendment purposes occurs when there is a governmental termination of freedom of movement through means intentionally applied; thus, a person who is stopped as a result of a roadblock has been seized within the meaning of the Fourth Amendment.  Willis

11

v. Mock, 600 F. App'x 679, 683-84 (11th Cir. 2015) (citing Brower v. County of Inyo, 489 U.S. 593, 597 (1989)); United States v. Regan, 218 F. App'x 902, 903 (11th Cir. 2007) ("It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment.").   A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. Regan, 218 F. App'x at 903.   "The United States Supreme Court, however, has 'recognized . . . limited circumstances in which the usual rule of individualized suspicion does not apply.'" Regan, 218 F. App'x at 903.  In order to determine whether a suspicionless seizure is reasonable, the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty are weighed.  Regan, 218 F. App'x at 903. Although utilizing a roadblock for the primary purpose of detecting evidence of ordinary criminal wrongdoing has been held to be unconstitutional, certain circumstances may justify a law enforcement checkpoint even though the primary purpose of the search would relate to ordinary crime control.  United States v. Rodger, 521 F. App'x 824, 828-29 (11th Cir. 2013), citing City of Indianapolis v. Edmond, 531 U.S. 32, 37, 40 (2000).  For example, the Supreme Court has explained that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up . . . to catch a dangerous criminal who is likely to flee by way of a particular route."  City of Indianapolis v. Edmond, 531 U.S. 32, 44 (2000); Rodger, 521 F. App'x at 828-29 (explaining that roadblock set up in the path of dangerous, armed robbery suspect who

12

was traveling at speeds of over 100 miles per hour did not violate the Fourth Amendment because it was appropriately tailored to protect the state's interest in capturing the criminal while minimizing the intrusion on driver's privacy because only persons who matched the description of the robber were stopped); United States v Harper, 617 F.2d 35, 40-41 (4th Cir. 1980) (finding that roadblock and stop of all persons for the purpose of arresting dangerous suspects for a known crime along a route on which it would be reasonably expected that the suspects would be fleeing was reasonable).

Applying these principles to the facts of this case, Officer Anderson's blockade of the westbound lands of traffic at the intersection of LaVista Road and Northlake Parkway was reasonable.  First, the public concerns served by the seizure were grave.  Here, alleged armed robbers were attempting to evade law enforcement and a bystander asserted that the robbers were located in the intersection which Officer Anderson blocked.  Furthermore, the seizure advanced the public interest as it was narrowly tailored to block cars traveling in the intersection in which the escaping robbers were believed to be located in order to apprehend them.  Finally, the severity of the interference in individual liberty was minimal as Officer Anderson only blocked the intersection briefly because Officer Anderson began to suspect and followed individuals in the Chevy Lumina who veered out of the intersection at a high rate of speed thereby removing the blockade of the roadway.  Officer Anderson also only looked for

13

individuals matching the description given by dispatch.[1]  (Tr. 12, 20).  Under these circumstances, the seizure at the intersection did not offend the Fourth Amendment. <u>Rodger</u>, 521 F. App'x at 828-29; <u>Harper</u>, 617 F.2d at 40-41.

Defendants further argue the guns, duffel bag, and ski mask found at the scene of Reese's arrest should be suppressed because they are fruit of the poisonous tree.  Reese also argues his subsequent statements should be suppressed as fruit of the poisonous tree.  Given that Officer Anderson's road block was reasonable and lawful, Reese's subsequent statements and the evidence found at the scene of his arrest were not fruit of the poisonous tree.

## II.  <u>Reese's Statements Should Be Suppressed</u>

Reese contends that the statements he made to Officer Anderson while he was in Officer Anderson's patrol car should be suppressed because Officer Anderson elicited them while he was in custody without reading him his <u>Miranda</u> rights.  Reese further contends that statements he made to Detective Tappan during a custodial interrogation also should be suppressed because Detective Tappan continued to question him after he invoked his right to remain silent.

---

[1]  The fact that the information given by dispatch regarding the description of the robbers during an ongoing emergency situation might not have been detailed (dispatch only identified the robbers as two black males) and the description of their getaway vehicle might not have been accurate is of no consequence here.  Officer Anderson credibly testified that a bystander indicated that the robbers were traveling towards the intersection Officer Anderson ultimately blocked.  (Tr. 12, 19, 22)

### A.    Reese's Statements to Officer Anderson in the Patrol Car

Defendant Reese first argues the comments he made to Officer Anderson in the patrol car should be suppressed because Officer Anderson should have known that the accusations he made in the patrol car would elicit Reese's incriminating response.  The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial.  U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations.  Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress' attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient).  The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  The "functional equivalent" of express questioning occurs when officers use "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301.  By contrast, "'[v]oluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning.'"  United States v. Sanders, 315 F. App'x 819, 823 (11th Cir. 2009) (quoting Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991)); see also Miranda,

15

384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment . . . .").

The Government does not dispute that Officer Anderson's conversation with Reese was designed to elicit an incriminating response from Reese while he was in custody before Miranda warnings were read to him.  Instead, the Government states that it does not intend to use Reese's statements in its case-in-chief, but may use the statements to impeach him. (Gov't's Br. 5).  It is legally permissible for the Government to use Reese's statements while in the patrol car to impeach his credibility, because there is no question that they were voluntarily made.  See Oregon v. Hass, 420 U.S. 714, 722-23 (1975) (Miranda violation resulting from law enforcement disregard of invocation of right to counsel does not preclude a defendant's voluntary statement from being used for impeachment purposes);  McGriff v. Dep't of Corrs., 338 F.3d 1231, 1236 (11th Cir. 2003), cert. denied, 540 U.S. 1118 (2004).  In assessing whether a confession was voluntary, the court must determine whether the defendant "'made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.'"  Martin v. Wainwright, 770 F.2d 918, 928 (11th Cir.1985), modified on other grounds, 781 F.2d 185 (11th Cir. 1986).  There is no indication that Officer Anderson threatened, harmed, or gave improper inducements in order to procure Reese's confessions before the Miranda warnings were read.  Although Officer Anderson criticized Reese for shooting at him, there is no indication that Officer Anderson threatened or intimidated Reese,

16

drew his weapon while speaking with him, or otherwise overbore his will.   Thus, Reese's statements to Officer Anderson were voluntarily made.

Moreover, the alleged unlawful efforts producing Reese's initial, un-Mirandized statement within the patrol car would not taint subsequent statements.   When a defendant makes a pre-Miranda statement that is subject to suppression, the taint only transfers to subsequent statements made after the defendant has waived his Miranda rights if the first confession was inadmissible as involuntary.   Elledge v. Dugger, 823 F.2d 1439, 1443 (11th Cir. 1987) (explaining that confessions obtained by failing to honor a request to stop questioning is a technical violation of Miranda, but does not make the confession "involuntary" and they do not taint subsequent confessions); United States v. Harrold, 679 F. Supp. 2d 1336, 1346 (N.D. Ga. 2009).   Thus, the issue of whether Reese's statements to Officer Anderson in the patrol car were unlawfully procured is deemed **MOOT**.

### B.   Reese's Statements in the Interrogation Room

Defendant Reese further argues, however, that Detective Tappan violated his right to remain silent when Detective Tappan continued questioning him after he unambiguously asserted his right to remain silent in the interrogation room at police headquarters.   In support, Reese contends that he asserted his right to remain silent when he told Tappan that he did not want to talk to anyone other than "the feds"[2] and again

---

[2]  The Government did not respond to Reese's argument that Reese invoked his right to remain silent when he stated that he did not want to talk to anyone other than the feds.

when he refused to initial the <u>Miranda</u> form to indicate that he understood his rights. As previously stated, the "<u>Miranda</u> safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." <u>Innis</u>, 446 U.S. at 300-01; <u>United States v. Acosta</u>, 363 F.3d 1141, 1148 (11th Cir. 2004); <u>see also</u> <u>United States v. Grimes</u>, 142 F.3d 1342, 1348-49 (11th Cir. 1998) (applying <u>Miranda</u> only if defendant was both (a) in custody and (b) being interrogated at the time the statements were made). In this case, the Government does not dispute that Reese was in custody and was interrogated by Detective Tappan.

If a defendant indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. <u>Miranda</u>, 384 U.S. at 473-74 (explaining that "[w]ithout the right to cut off questioning, the setting of an in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked"); <u>Gore v. Sec'y for Dep't of Corr.</u>, 492 F.3d 1273, 1296 (11th Cir. 2007) ("Under <u>Miranda</u>, therefore, all questioning must be immediately discontinued once a suspect indicates a desire to remain silent."); <u>United States v. Christopher</u>, 824 F.2d 836, 841-42 (11th Cir. 1987) (holding that where officers violated the defendant's right to cut off questioning, all statements taken during the unlawfully continued interrogation were inadmissible). The suspect does not have to "speak with the discrimination of an Oxford don" or use specific words to invoke his right to silence; he simply "must articulate his desire to end questioning with sufficient clarity so that a reasonable police officer would understand that statement to be an

18

assertion of the right to remain silent." <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994); <u>United States v. Racca</u>, 255 F. App'x 367, 370 (11th Cir. 2007); <u>United States v. Mikell</u>, 102 F.3d 470, 476 (11th Cir. 1996).  If the defendant's statement is ambiguous or equivocal, the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation.  <u>Coleman v. Singletary</u>, 30 F.3d 1420, 1424 (11th Cir. 1994).  The fact that a defendant answers additional questions or continues to speak after the police failed to scrupulously honor the defendant's right to end the questioning cannot be used to cast retrospective doubt on the clarity of the initial request to remain silent.  <u>Christopher</u>, 824 F.2d at 841.

In this case, Reese unequivocally invoked his right to remain silent.  In the interrogation room, prior to reading Reese his <u>Miranda</u> warnings, Detective Tappan asked questions about Reese's girlfriend and Reese indicated that "the money" did not have anything to do with his girlfriend.  (Doc. 69, audio disk).  After Detective Tappan responded, "Okay, that may be true.  I mean, we can, well I'll investigate whatever you tell me to," Reese replied, "I don't want to talk to nobody but the feds, man.  I just got out the fed."  (Def.'s Ex. 1; Doc. 69, audio disk).  Detective Tappan clarified, "You don't want to talk to anybody but the feds."  Reese responded, "Yup."  (<u>Id.</u>).  Reese's words in this regard can only be interpreted in one way: that he wanted to cease questioning by Detective Tappan, who was employed by the DeKalb County Police Department, and wait for a federal agent.  <u>See</u> <u>Arnold v. Runnels</u>, 421 F.3d 859, 865-66 (9th Cir. 2005) (explaining that where defendant stated that "he didn't want to talk on

AO 72A
(Rev.8/82)

tape," his invocation of his rights was neither ambiguous nor equivocal and that any reasonable application of the law must begin by recognizing that the defendant clearly and unequivocally invoked his Miranda rights selectively, with respect to a tape-recorded interrogation).  Reese's statements were tantamount to saying that he wanted to remain silent until federal agents questioned him.  The Supreme Court has held that a suspect, through the exercise of his right to terminate questioning "can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." Michigan v. Mosley, 423 U.S. 96, 103-04 (1975); Christopher, 824 F.2d at 839 (explaining that enabling the suspect to control the time at which questioning occurs, the subjects discussed, and the duration of the investigation serves as an essential check on the coercive pressures of the custodial setting).  Thus, if a suspect clearly and unequivocally invokes his Miranda rights selectively, that is a sufficient invocation of the right to remain silent with respect to the specific situation covered by the invocation.  2 Wayne R. LaFave et al., Criminal Procedure ¶ 6.9(g) (4th ed. 2015); see also Ford v. Hall, 546 F.3d 1326, 1339-40 (11th Cir. 2008) (explaining that Georgia Supreme Court's opinion, which concluded among other things, that police were only required to honor defendant's limited invocation of the right to counsel (defendant wanted counsel if the police video-taped his statement) to the extent of the express limits of his reservation, was not objectively unreasonable); cf Connecticut v. Barrett, 479 U.S. 523, 529 (1987) (noting that where the defendant invoked his right to counsel by refusing to make written statements without the presence of his attorney, violations of

20

his limitation without meeting waiver standards would clearly be inadmissible); <u>United States v. Downs</u>, No. 5:13-CR-152, 2014 WL 3736056, at *5 (D. Vt. July 29, 2014); <u>United States v. Russo</u>, No. 3:14-CR-00014-TCB, 2015 WL 7115860, at *7 (N.D. Ga. 2015) (holding that where defendant indicated that she would not answer questions with respect to particular topics without an attorney present, law enforcement could not question her about those topics without violating her right to counsel). Thus, it is clear that Reese was unequivocally invoking his right to silence with respect to questioning by Detective Tappan or any other law enforcement official who was not a federal agent. <u>See, e.g.</u>, <u>United States v. Muhammad</u>, 196 F. App'x 882, 885-86 (11th Cir. 2006) (explaining that "Muhammad's unequivocal statement during the interrogation that 'he did not want to talk to [Inspector Willis] anymore' was a clear invocation of his constitutionally protected right to cut off questioning and to remain silent"); <u>United States v. Williams</u>, No. 12-60116-CR-RNS, 2012 WL 4449439, at *3 (S.D. Fla. Sept. 26, 2012) (holding that the defendant's statement "I don't even wanna talk" was a clear and blunt indication that he did not wish to speak to police). Reese's subsequent conduct in answering non-routine questions after answering routine booking questions has no bearing on whether he invoked his right to silence and does not provide justification for Detective Tappan to ignore his earlier invocation of the right to remain silent. <u>Compare</u> <u>Smith v. Illinois</u>, 469 U.S. 91, 99-100 (1984) (explaining that "postrequest responses to further interrogation may not be used to cast doubt on the clarity of the initial request itself"); <u>Christopher</u>, 824 F.2d at 841; <u>with</u> <u>Muhammad</u>, 196

21

F. App'x at 885-86 (explaining that officer's request for biographical information from defendant after defendant invoked his constitutional right to silence did not constitute recommencement of formal interrogation).

Because Reese invoked his right to silence as to questioning by Detective Tappan, Detective Tappan was required to scrupulously honor his request.  If a suspect unequivocally invokes his right to remain silent, the police must scrupulously honor the invocation, by cutting off questioning.  Mosley, 423 U. S. at 103-104; United States v. Muhammad, 196 F. App'x 882, 885 (11th Cir. 2006).  The question of whether a defendant's right to cut off questioning was scrupulously honored is evaluated on a case by case basis.  Jackson v. Dugger, 837 F.2d 1469, 1472 (11th Cir. 2006).  The scrupulously honored standard, at a minimum, requires the government to refrain from questioning a suspect unless the suspect both (1) initiates further conversation; and (2) waives the previously asserted right to silence.  Muhammad, 196 F. App'x at 885; Jacobs v. Singletary, 952 F.2d 1282, 1293 (11th Cir. 1992).  The Government has the burden of proving that suspect waived his right to silence and reinitiated conversation.  See, e.g., J.D.B. v. N. Carolina, 564 U.S. 261, 269-70 (U.S. 2011) (holding that if a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a prerequisite to the statement's admissibility in the Government's case in chief, that the defendant voluntarily, knowingly and intelligently waived his rights); Everett v. Sec'y, Fla. Dep't of Corr., 779 F.3d 1212, 1241 (11th Cir. 2015); United States v. Chaidez-Reyes, 996 F. Supp. 2d 1321, 1345 (N.D. Ga. 2014)

22

("The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of Miranda and were otherwise voluntary.").

In this case, Detective Tappan did not refrain from questioning after Reese asserted his right to silence. Instead, Detective Tappan Mirandized Reese and reinitiated the interrogation after asking Reese some routine questions. Mikell, 102 F.3d at 476; (Doc. 69 (audio disk); Gov't's Ex. 2; Tr. 141-48). There is no evidence that Detective Tappan waited for any significant period of time to reinitiate the interrogation. Under these circumstances, this Court cannot conclude that Detective Tappan scrupulously honored Reese's assertion of the right to silence. Accordingly, all statements (other than statements made in response to routine biographical questions) made after Reese invoked his right to remain silent, are inadmissible and should be **SUPPRESSED**. United States v. Gomez, 927 F.2d 1530, 1536 (11th Cir. 1991) (statements made by officers regarding benefits of cooperation and the possible severity of sentence made after invocation of right to counsel were impermissible interrogation); Christopher, 824 F.2d at 841-42, 845 (holding that the police may make routine inquiries of a suspect after he requests that they terminate questioning such as whether he would like a drink of water, but may not ask questions or make statements which open up a more generalized discussion relating directly or indirectly to the investigation, as this constitutes interrogation); United States v. Johnson, 812 F.2d 1329, 1331 (11th Cir. 1986) (explaining that when FBI agent asked defendant whether he wanted to know

what would happen to him after defendant invoked his right to counsel, defendant's statements that followed were inadmissible because such statements are often designed to inform the accused that cooperation may be beneficial and explaining that "[i]t best serves all interests, especially law enforcement, to remain close to the 'bright line'" and that interrogation must cease when an accused in custody requests the presence of a lawyer before further interrogation); United States v. Williams, No. 12-60116-CR-RNS, 2012 WL 4449439, at *1 (S.D. Fla. Sept. 26, 2012) (concluding that where detective told defendant "before we really talk to you, we have to explain your rights to you and everything," defendant responded, "I don't even wanna talk," and detective inquired, "You don't want to know what's goin' on," defendant's subsequent statements were inadmissible because defendant made an unambiguous assertion of his right to silence and further comment by the detective did not scrupulously honor that right).

## CONCLUSION

Based on the aforementioned reasons, Defendant Reese's Motions to Suppress should be **GRANTED IN PART AND DENIED IN PART**. (Doc. 26, 41). Defendant Philpot's Motion should be **DENIED**. (Doc. 37). There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial. Therefore, this action is **CERTIFIED READY FOR TRIAL**.

**SO ORDERED, REPORTED AND RECOMMENDED** this  3  day of June, 2016.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

24